UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STAGG P.C., | |
| Plaintiff, | |
| -v.- | 15 Civ. 8468 (KPF) |
| U.S. DEPARTMENT OF STATE; DIRECTORATE OF DEFENSE TRADE CONTROLS; and MIKE POMPEO (in his official capacity only as Secretary of State), | OPINION AND ORDER |
| Defendants. | |

KATHERINE POLK FAILLA, District Judge:

This litigation was prompted by a proposed, but never enacted, regulatory amendment; even today, years into the litigation, the parties' disputes occasionally tilt toward the speculative or the hoped-for, rather than the actual. At base, the suit concerns First and Fifth Amendment facial challenges to the International Traffic in Arms Regulations (the "ITAR"), 22 C.F.R. parts 120-130, which is the regulatory regime that implements the Arms Export Control Act of 1976 (the "AECA"), 22 U.S.C. ch. 39. Among other things, the ITAR imposes strict licensing requirements on exporting technical data related to "defense articles," such as blueprints for tanks and nuclear weapons. Plaintiff, a law firm that advises clients and publishes free educational materials on export control matters, seeks to disseminate certain technical data via public presentations within the United States and on its public website. It argues that the ITAR in its current form imposes an

unconstitutional prior restraint on Plaintiff's anticipated expressive activities and is as well unconstitutionally overbroad and vague.

After a failed application for injunctive relief and an appeal of same, the matter returned to this Court in 2018, and the parties cross-moved for summary judgment. This Court does not accept either side's arguments *in toto*, but after evaluating the unambiguous text of the ITAR, as opposed to the parties' glosses thereon, it cannot discern the constitutional infirmities identified by Plaintiff. Accordingly, and for the reasons stated in this Opinion, Plaintiff's motion for summary judgment is denied, and Defendants' motion for summary judgment is granted.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The International Traffic in Arms Regulations

The AECA restricts the import and export of "defense articles and defense services," including such articles as tanks and nuclear weapons. *See* 22 U.S.C. § 2751. To enforce the AECA, the United States Department of State (the

---

[1]    For ease of reference, the parties' moving papers are referred to as follows: Plaintiff's opening brief in support of its motion for summary judgment is referred to as "Pl. Br." (Dkt. #63); Defendants' combined brief in opposition to Plaintiff's motion and brief in support of their cross-motion for summary judgment as "Def. Br." (Dkt. #69); Plaintiff's combined reply brief and brief in opposition to Defendants' motion as "Pl. Reply" (Dkt. #75); and Defendants' reply brief as "Def. Reply" (Dkt. #81). The parties have each submitted statements and counterstatements pursuant to Local Civil Rule 56.1 (Dkt. #65, 72, 73, 77); the Court notes, however, that the parties do not rely on these materials in advancing their respective arguments, and the Court therefore does not cite them in this Opinion. The parties do reference certain allegations in the operative pleading, Plaintiff's First Amended Complaint, which the Court refers to as the "FAC" (Dkt. #27). Finally, the Court has obtained a copy of the recording of the oral argument held before the Second Circuit in this case on December 7, 2016, which it cites to using the convention "Tr." and the time index associated with the recording.

"Department") promulgated the ITAR regulatory regime in 1976. *See* 22 U.S.C. § 2778(b)(2); 22 C.F.R. parts 120-130. The ITAR defines "defense service" to include the "furnishing to foreign persons of any technical data controlled under this subchapter[.]" 22 C.F.R. § 120.9(a)(2). And in keeping with its animating purposes, the ITAR requires a license to export "technical data" that is "required for the design, development, production … or modification of defense articles," including "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

The ITAR's technical data licensing requirement excludes, among other categories, "information in the public domain." 22 C.F.R. § 120.10(b). "Public domain," in turn, is defined as follows:

> Public domain means information which is published and which is generally accessible or available to the public:
>
> (1)    Through sales at newsstands and bookstores;
>
> (2)    Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;
>
> (3)    Through second class mailing privileges granted by the U.S. Government;
>
> (4)    At libraries open to the public or from which the public can obtain documents;
>
> (5)    Through patents available at any patent office;
>
> (6)    Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7) Through public release (*i.e.*, unlimited distribution) in any form (*e.g.*, not necessarily in published form) after approval by the cognizant U.S. government department or agency (*see also* § 125.4(b)(13) of this subchapter);

(8) Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community[.]

22 C.F.R. § 120.11(a). The parties agree generally that information available from one of these public domain sources is excluded from the ITAR's licensing requirements. (*See, e.g.*, Def. Br. 7, 9 n.4 ("[I]nformation that is already in the public domain, through various means, is not treated as ITAR-controlled.")).

On June 3, 2015, the Department issued a notice of proposed rulemaking that would have amended the definition of public domain to state that "technical data … is *not* in the public domain if it has been made available to the public without authorization." 80 Fed. Reg. 31,525, 31,535 (emphasis added). The preamble to the proposed revision states:

Paragraph (b) of the revised definition explicitly sets forth the Department's requirement of authorization to release information into the "public domain." Prior to making available "technical data" or software subject to the ITAR, the U.S. government must approve the release….

*The requirements of paragraph (b) are not new.* Rather, they are a more explicit statement of the ITAR's requirement that one must seek and receive a license or other authorization from the Department or other cognizant U.S. government authority to release ITAR controlled "technical data," as defined in § 120.10. A release of "technical data" may occur by disseminating "technical data" at a public conference or trade show, publishing "technical data" in a book or journal article,

> or posting "technical data" to the Internet.  This
> proposed provision will enhance compliance with the
> ITAR by clarifying that "technical data" may not be
> made available to the public without authorization.
> Persons who intend to discuss "technical data" at a
> conference or trade show, or to publish it, must ensure
> that they obtain the appropriate authorization.

*Id.* at 31,528 (emphasis added).  To date, however, this amendment has not

been promulgated.

Several other developments concerning the ITAR merit mention.  On

May 24, 2013, the Department posted a notice in the Federal Register

responding to comments seeking clarification of the current definition of

"defense service," which notice stated in relevant part:

> Five commenting parties recommended ITAR
> § 120.9(a)(4) be revised to clarify that an aggregation of
> public domain data is still public domain data, and two
> commenting parties requested clarification that the
> aggregation of public domain data cannot be considered
> a defense service or render the data "other than public
> domain."  The Department confirms that a defense
> service involves technical data and therefore the use of
> publicly available information would not constitute a
> defense service according to the new ITAR § 120.9(b)(2).
> The Department notes, however, that it is seldom the
> case that a party can aggregate public domain data for
> purposes of application to a defense article without
> using proprietary information or creating a data set that
> itself is not in the public domain.

78 Fed. Reg. 31,444, 31,445.  On June 3, 2015, the Department further

clarified that a "release of 'technical data' may occur by ... posting 'technical

data' to the Internet."  80 Fed. Reg. 31,525, 31,528.  And on June 3, 2016, the

Department updated the ITAR's definition of "export" to include "releasing or

otherwise transferring technical data to a foreign person in the United States (a 'deemed export')."  22 C.F.R. § 120.17(a)(2).

### 2. The Information Plaintiff Seeks to Use and Disseminate

Plaintiff "is a law firm that advises clients on export control matters … [and] publishes free educational information to the public on export control matters." (FAC ¶ 5).  Plaintiff has announced plans to develop "presentation and written materials" using "published and generally accessible public information that is available from bookstores and libraries, and for which foreign persons already have access to.  This information would have otherwise constituted technical data but is excluded from the technical data provisions because it is in the public domain." (*Id.* at ¶¶ 6, 49).  However, Plaintiff underscores, "these materials were not authorized by the Defendants into the public domain." (*Id.* at ¶ 52).  Further, Plaintiff contemplates that it "would also aggregate and modify public domain information to provide more interactive examples[.]" (*Id.* at ¶ 54).

Plaintiff plans to use its presentations and written materials in public speaking, including at public conferences in Manhattan, New York, and in "free educational materials on the ITAR's technical data provisions[.]" (FAC ¶ 46).  "Plaintiff reasonably believes that foreign persons will have access to the presentations and the published materials because they will be freely distributed at the public conferences and also made publicly available on the Plaintiff's website and through other channels of communication." (*Id.* at ¶ 53).

Plaintiff further intends its speech to educate "the public on how to comply with the ITAR's technical data controls and to inform the public with how the government implements such regulations." (FAC ¶ 48). Plaintiff's speech "would also contain some comments critical of the government and … propose future regulatory revisions in this area." (*Id.*). It is Plaintiff's concern that, given various interpretive statements from the Department, Plaintiff's contemplated conduct may run afoul of the Department's construction of the ITAR without actually running afoul of the regulations' text and, alternatively, that the ITAR as construed by the Department is unconstitutional.

## B.    Procedural Background

Plaintiff commenced this action on October 28, 2015, challenging the constitutionality of the ITAR under the First and Fifth Amendments. (Dkt. #1). On November 2, 2015, Plaintiff moved for a preliminary injunction. (Dkt. #15). While the motion was pending, on December 3, 2015, Plaintiff filed the FAC, alleging that the ITAR's "licensing requirement … is facially invalid as an unconstitutional prior restraint on speech, is overly broad, vague, lacks any procedural safeguards, provides boundless discretion to government officials, and fails to provide any judicial review," in violation of the First Amendment. (FAC ¶ 58). Plaintiff also alleged that the ITAR's licensing provision "violates the Fifth Amendment because it is vague to the public and fails to provide fair notice, constitutes a delegation of authority to government officials in its enforcement, violates clearly established legal standards that an agency must

announce and explain a departure from long-standing practice, and applies retroactively as an *ex post facto* law." (*Id.* at ¶ 61).

On January 26, 2016, the Honorable Shira A. Scheindlin, to whom the case was then assigned, found that Plaintiff had standing to seek injunctive relief on a claim of prior restraint, but denied the motion for a preliminary injunction. (Dkt. #35). *See Stagg P.C.* v. *U.S. Dep't of State*, 158 F. Supp. 3d 203, 209, 211 (S.D.N.Y. 2016) ("*Stagg I*"). Plaintiff appealed from the denial; in April 2016, during the pendency of the appeal, the case was reassigned to the undersigned.

On December 16, 2016, the Second Circuit affirmed both Judge Scheindlin's finding of standing and her denial of the application for injunctive relief. *See Stagg P.C.* v. *U.S. Dep't of State*, 673 F. App'x 93, 94-95 (2d Cir. 2016) (summary order) ("*Stagg II*"). Following the Second Circuit's decision in *Stagg II*, the Department posted the following notice to the Frequently Asked Questions ("FAQ") section of its website:

> Q: I found some information in a book at a library and I think it might be technical data. Do I need authorization from [Defendant] to republish this information?
>
> A: No. Information that is available in printed books, newspapers, journals, and magazines that you can buy in a physical bookstore or newsstand, check out from a public library, or receive in the mail through a subscription or 2nd class U.S. mail does not need any approval from [Defendant] for republication. The Department is providing this guidance to clarify the preamble of the June 3, 2015 Notice of Proposed Rulemaking .... The Department received public comments and other feedback from the public that raised questions about whether it was necessary to

obtain the Department's approval prior to republishing information found in books and academic journals.

ITAR / USML Updates FAQs,

https://www.pmddtc.state.gov/?id=ddtc_public_portal_faq_detail&sys_id=7666

4ae2db9b57003b1272131f9619aa (last visited Jan. 28, 2019).[2]

Plaintiff then petitioned the United States Supreme Court for a writ of certiorari. The petition was denied on January 8, 2018. *See Stagg P.C.* v. *Dep't of State*, 138 S. Ct. 721 (Mem.), 722 (2018).

After the case was transferred back to this Court, the Court held a conference on February 14, 2018, to discuss next steps and schedule further motion practice. (*See* Dkt. #55 (transcript of conference)). The parties then cross-moved for summary judgment, with principal briefing concluded in August 2018, and supplemental briefing concluded in November 2018. (*See* Dkt. #62-87).

## DISCUSSION

**A.     Applicable Law**

**1.     Summary Judgment Motions**

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty*

---

[2]     "USML" is an abbreviation for the United States Munitions List.

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[3] A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.

### 2. The Requirement of Article III Standing

Before the Court considers Plaintiff's constitutional challenges to the ITAR, however, it must resolve Defendants' claims that Plaintiff cannot properly bring such challenges. To establish standing, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized," and "(b) actual or imminent, not conjectural or hypothetical." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted).[4] "Abstract" injury, or "[a]llegations of possible future injury" in "the area of speculation and conjecture," "do not satisfy the[se] requirements." *Whitmore* v. *Arkansas*, 495 U.S. 149, 155, 158 (1990). Further, "[t]o establish causation for purposes of standing, the plaintiff must allege an injury 'fairly traceable' to the defendant's conduct." *Pritsker* v. *McKee*,

---

[3] The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory committee's notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

[4] The related concept of mootness is discussed *infra* in the text.

692 F. App'x 662, 663 (2d Cir. 2017) (summary order) (quoting *Allen* v. *Wright*, 468 U.S. 737, 751 (1984)).

In the specific context of First Amendment claims, allegations of a "subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (internal quotation omitted). A plaintiff must "proffer some objective evidence to substantiate its claim that the challenged regulation has deterred it from engaging in protected activity." *Latino Officers Ass'n* v. *Safir*, 170 F.3d 167, 170 (2d Cir. 1999) (internal quotation and alterations omitted). That said, the requirements for standing to challenge a prior restraint under the First Amendment are relatively lenient. "'When a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without first applying for, or being denied, a license.'" *Stagg I*, 158 F. Supp. 3d at 209 (quoting *City of Lakewood* v. *Plain Dealer Pub. Co.*, 486 U.S. 750, 755-56 (1988)).

### 3.      First Amendment Claims Regarding Speech-Licensing Laws

To review, Plaintiff brings challenges under the First and Fifth Amendment. Beginning with the former, the law is clear that Government regulations that restrict speech based on its content are subject to strict scrutiny under the First Amendment. *See Riley* v. *Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790 (1988). "Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content

11

before the speech is communicated." *In re G. & A. Books, Inc.*, 770 F.2d 288, 296 (2d Cir. 1985). "This may take the form of ... systems of administrative preclearance that give public authorities the power to bar the publication or presentation of material." *Id.* (internal citations omitted). To pass muster under the First Amendment, prior restraints must be "accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U.S. 546, 559 (1975); *see also Freedman* v. *Maryland*, 380 U.S. 51, 58-59 (1965) (establishing required procedural safeguards for constitutional prior restraints).

In contrast, government regulations of speech that are not content-based, and that only incidentally restrict expression, are subject to intermediate scrutiny. *See United States* v. *O'Brien*, 391 U.S. 367, 376-77 (1968). "A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180, 189 (1997). "The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward* v. *Rock Against Racism*, 491 U.S. 781, 791 (1989).

### 4. Fifth Amendment Claims Regarding Due Process and Vagueness

Plaintiff's Fifth Amendment claims implicate issues of notice. "[T]he void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *VIP of Berlin, LLC* v. *Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (internal citations and quotation marks omitted). A law is unconstitutionally vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits ... [or] authorizes or even encourages arbitrary and discriminatory enforcement." *Id.*

### 5. Deference to Agency Interpretations

Finally, certain of the parties' arguments stem from the Department's interpretation of its own regulations. "When an agency's regulations are ambiguous, a court must defer to the agency's interpretation of its own regulations, unless that interpretation is 'plainly erroneous or inconsistent with the regulation[s] or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'" *Mullins* v. *City of New York*, 653 F.3d 104, 105-06 (2d Cir. 2011) (per curiam) (quoting *Talk Am., Inc.* v. *Michigan Bell Tel. Co.*, 564 U.S. 50, 59 (2011)); *see also Decker* v. *Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013) ("[A]n agency's interpretation need not be the only possible reading of a regulation — or even the best one — to prevail."); *cf. Chevron U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984)

(discussing amount of deference accorded an agency's interpretation of a statute it administers).

Conversely, where there is no ambiguity in the regulatory language, there is no deference accorded to the agency's interpretation. *See generally Digital Realty Trust, Inc.* v. *Somers*, — U.S. —, 138 S. Ct. 767, 781-82 (2018) (holding that agency regulation was not entitled to *Chevron* deference as to the meaning of a statutory provision that was "unambiguous"); *cf. Nat. Res. Def. Council* v. *Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 n.10 (2d Cir. 2018) ("NHTSA does not argue that we owe its interpretation of [the Energy Policy and Conservation Act] any deference, nor could it, because it has not identified a section of EPCA that presents any relevant ambiguity on the question of its statutory authority to publish the Suspension Rule. And deference is clearly not warranted under the Improvements Act. The language is unambiguous, and the Act applies to all federal agencies, meaning NHTSA has no special expertise in interpreting its language." (internal citations omitted)).

## B. Analysis

### 1. Plaintiff Has Standing to Bring Its First and Fifth Amendment Challenges

Defendants argue first that Plaintiff lacks standing because "both the plain language of the ITAR's public domain exception … and the recent FAQ make clear that the information in printed books, newspapers, journals, and magazines in physical bookstores and public libraries that [Plaintiff] claims that it wants to republish does not require a license for republication." (Def. Br. 18). The Court is disappointed to see Defendants spend so much of their

briefing on challenges that have been made, and rejected, thrice before in this action. *See Stagg I*, 158 F. Supp. 3d at 209; *Stagg II*, 673 F. App'x at 94-95. (*See* Dkt. #57). The Court rejects them once again.

To start, Defendants' focus on *printed* mediums and *physical* bookstores and libraries mischaracterizes the FAC. Plaintiff seeks to disseminate materials that are already "published and generally accessible public information ... available from bookstores and libraries" (FAC ¶ 49), and that are "in the public domain" (*id.* at ¶ 50), but that "were not authorized by the Defendants into the public domain" (*id.* at ¶ 52). (*See also* Dkt. #28 at ¶ 5 (explaining that Plaintiff sought to disseminate "information that met the public domain exclusion within 22 C.F.R. § 120.11 because the information was published, generally accessible, and available to the public from bookstores or public libraries")). The FAC does not specify the medium in which these materials are currently accessible to the public. Nor does the plain text of the ITAR limit the public domain exception to particular media, such as *printed* books and *physical* bookstores. *See* 22 C.F.R. § 120.11 (not including the words "printed," "physical," or any synonyms for the same); *Stagg II*, 673 F. App'x at 97 ("[G]overnment counsel was unable to direct us to a provision that qualifies 22 C.F.R. § 120.10(b), which presently exempts from the definition of technical data, subject to ITAR, *inter alia*, 'information in the public domain as defined in § 120.11.'").

And while Plaintiff has indicated its intent to republish the materials in a medium other than printed books or physical bookstores — specifically, on the

Internet (*see* FAC ¶ 53) — the plain language of 22 C.F.R. § 120.11 does not consider the medium of *re*publication in determining whether materials fall within the ITAR's public domain exception. In point of fact, Defendants' focus on printed and physical media only weakens their position on standing, in that it substantiates Plaintiff's reasonable fear of prosecution were it to use technical data that amounts to "published and generally accessible public information" available from non-printed, non-physical sources.

Judge Scheindlin previously determined that Plaintiff had standing on two independent bases, citing allegations in the FAC that (i) Plaintiff possesses "certain technical data, available in — but unauthorized for release into — the public domain," and that (ii) Plaintiff "wants to aggregate" this data into new materials. *Stagg I*, 158 F. Supp. 3d at 209. In affirming Judge Scheindlin's determination of standing, the Second Circuit similarly relied on Plaintiff's statement that it "seeks to disseminate information already in its possession subject to ITAR's challenged licensing requirement[.]" *Stagg II*, 673 F. App'x at 94-95. Indeed, the Second Circuit noted that "the [G]overnment unambiguously confirmed at oral argument that Stagg correctly characterizes the government's interpretation of the existing regulatory scheme [as requiring a license to use technical data that entered the public domain without prior approval from Defendants] .... Thus, we agree that Stagg has standing to challenge that scheme as the [G]overnment construes it." *Id.* at 95 n.1.

More recently, this Court's May 8, 2018 Order stated that "the requirements for standing for a preliminary injunction are similar to those for

seeking summary judgment. Because Judge Scheindlin has already found, at the preliminary injunction stage, that the pleadings were sufficient to confer standing, and because the Second Circuit affirmed that decision, this Court will not reopen the issue." (Dkt. #57).[5]

Defendants' latest iteration of their standing arguments does not alter the Court's opinion. Plaintiff has standing to challenge the ITAR because, under the Government's own stated interpretation of the regulatory scheme, Plaintiff may be subject to prosecution for republishing technical data that was obtained from otherwise public domain sources, but that was not authorized by Defendants to be placed into the public domain.

### 2. Plaintiff's Claims Are Not Moot

At earlier stages of this action, both Judge Scheindlin and the Second Circuit noted the possibility that the Department might moot Plaintiff's claims. Judge Scheindlin commented that the Department might "reword or even withdraw" the proposed, 2015 amendment to the ITAR, "and obviate the need for this lawsuit." *Stagg I*, 158 F. Supp. 3d at 209 n.37. Similarly, during oral argument before the Second Circuit, Judge Reena Raggi remarked that the

---

[5] The Court's May 8, 2018 Order denied Defendants' motion for

> limited jurisdictional discovery regarding Plaintiff's standing ... [to] focus on: (1) the specific information or documents that Plaintiff has in its possession that it would like to publish, which it claims that it has not published for fear of violating the ITAR, and (2) the basis of Plaintiff's claim that the materials (although publicly available) have not been authorized into the public domain."

(Dkt. #52). The Order responded to a letter brief from Plaintiff asserting that no factual development was necessary because Plaintiff's was "a facial challenge [that] does not consider how the law is applied to a specific situation." (Dkt. #53).

Government could "represent that there will be no prosecution for the dissemination of material that's already in the public domain, and then you move on with the case." (Tr. 27:01-27:31). The Second Circuit's summary order went on to state:

> [M]any of Stagg's arguments ... could be read as attacking not the existing regulatory scheme, but either a proposed regulation that was never adopted, or a prior regulation that Stagg claims was once in force but has since been repealed. Constitutional questions about regulations that no longer exist or that have been under consideration do not present cases or controversies within a court's Article III jurisdiction.

*Stagg II*, 673 F. App'x at 95 n.1.

In short, were the Department to (i) disavow Plaintiff's characterization of its construction of the ITAR, and (ii) clarify that the allegations in the FAC address a proposed or prior interpretation of the regulation that does not currently control, this action would not continue. In the instant cross-motions, Defendants gesture in the direction of mootness by asserting that the FAQ notice posted to the Department's website following the Second Circuit's ruling clarified that "the information Stagg asserts it intends to publish — information available in *printed* books, newspapers, journals, and magazines that Stagg can buy in a *physical* bookstore or check out from a public library — does not require approval from the Department for export or republication." (Def. Br. 14 (emphases added)). Unfortunately, the gesture falls short.

As stated above, the FAC does not limit the materials that Plaintiff seeks to republish merely to information obtained from "printed" sources or "physical" bookstores and libraries. (FAC ¶ 49). Therefore, the Department's

FAQ notice does little to assure Plaintiff that the Government will not prosecute it for disseminating the materials in its possession. Moreover, Plaintiff also seeks to "aggregate and modify" the information that it plans to disseminate (*id.* at ¶ 54), which Judge Scheindlin properly determined to be an independent basis for standing, *see Stagg I,* 158 F. Supp. 3d at 209. The FAQ notice makes neither mention nor disclaimer of liability for aggregating public domain materials. Accordingly, the FAQ notice has not mooted Plaintiff's claim.

### 3. The Court Interprets the Text of the ITAR Differently Than the Parties

With those antecedent issues resolved, the Court now considers Plaintiff's facial challenge to the constitutionality of the ITAR's licensing provisions. (*See* Pl. Br. 7 ("This case presents a facial challenge and only pure questions of law … only the text of the regulations is required."); *see also* Def. Br. 18; Pl. Reply 16). "[A] facial challenge lies whenever a licensing law gives [a] government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood,* 486 U.S. at 759. "In analyzing a facial challenge under the First Amendment, we consider only the text of the [regulation], not the application of the [regulation] to a particular set of facts." *Lusk* v. *Village of Cold Spring,* 475 F.3d 480, 493 n.15 (2d Cir. 2007). Significantly, however, Plaintiff's claims — and Defendants' responses — rely heavily on certain disputed interpretations of the ITAR's current text. In consequence, the Court will address the parties' disputes about how to construe the ITAR as a threshold matter before turning to Plaintiff's constitutional arguments.

19

A word is in order about this portion of the Court's analysis. As made clear by the Second Circuit, Plaintiff has standing to challenge only the current ITAR, and not the June 3, 2015 proposed revision to the regulation. *See Stagg II*, 673 F. App'x at 95 n.1. The Court will thus consider Plaintiff's facial challenge solely as it pertains to the current text of the ITAR's "public domain" exclusion, and "deemed export" provision. See 22 C.F.R. §§ 120.11(a), 120.17(a)(2). Put somewhat differently, the Court will not consider any aspect of Plaintiff's briefing that purports to mount a facial challenge to text that has not been formally adopted into the ITAR. Relatedly, to the extent that the Court considers the Department's interpretation of the ITAR, it will look to the Department's statements on its website and in the Federal Register as indications of that interpretation.

   a.   **The ITAR Does Not Disqualify Information from the Public Domain Exclusion Solely Because the Information Entered the Public Domain Without Prior Government Authorization**

Plaintiff contends that the ITAR now requires an *ex ante* license to *re*publish technical data that entered the public domain without prior authorization from the Department. (Pl. Br. 3 ("[T]he ITAR *currently* imposes a prior restraint to use the public domain exclusion by … the republication of such publicly available technical data."); *id.* at 21 ("[T]he ITAR's regulation of domestic speech … applies to republication of information in the public domain."); Pl. Reply 6-15 (discussing an interpretation of the ITAR's public domain exclusion that does not cover technical data "made available to the public without authorization"); *see also* FAC ¶ 42 ("In [the June 3, 2015]

proposed rule, [the Directorate of Defense Trade Controls ("DDTC")] issued a public statement in the preamble that the *currently existing* public domain exclusion imposes a prior restraint[.]"); *id.* at ¶ 52 (alleging that Plaintiff has been stopped from distributing information that would otherwise qualify for the public domain exclusion but that was "not authorized by the Defendants into the public domain").  Proceeding from this premise, Plaintiff mounts a facial challenge to the ITAR's public domain exclusion.  *See* 22 C.F.R. §§ 120.10(b), 120.11(a).[6]

Considering the existing text of the ITAR, as the Court must, *see Lusk,* 475 F.3d at 493 n.15, the Court finds no support for the notion that information is somehow removed from the protection of the public domain exclusion solely because it became publicly available without prior authorization from the Government.  To the contrary, the ITAR unambiguously defines "public domain" as "information which is published and which is generally accessible or available to the public" through certain enumerated sources.  22 C.F.R. § 120.11(a).  Nowhere does the ITAR mention, or conceivably imply, that prior government authorization is required for public domain status.

---

[6]     Defendants argue that Plaintiff "conflate[s] the public domain exclusion, which excludes information that is already in the public domain from the ITAR's licensing and other requirements, and the ITAR's requirements that a license or other appropriate authorization be obtained prior to an unrestricted dissemination of ITAR-controlled technical data related to items on the USML in a manner that would provide access to foreign persons." (Def. Br. 18).  Defendants characterize the issue before the Court as, "whether the ITAR's licensing requirements, which require a license only to export information that constitutes ITAR-controlled technical data (including by providing it to foreign persons in the United States), are constitutional." (*Id.* at 19).  The Court reads the FAC differently to state a facial challenge to the ITAR's public domain exclusion.

This is not to say that Plaintiff's concerns are unfounded.  The Court recognizes that the Department has, at times, appeared to advance a different interpretation of the public domain exclusion.  On June 3, 2015, for example, the Department proposed a revised definition of public domain stating that "technical data … is not in the public domain if it has been made available to the public without authorization."  80 Fed. Reg. 31,525, 31,535.  While Plaintiff has no standing to mount a facial challenge to this proposed-but-not-enacted revision, the preamble suggests that the proposed revision actually reflects the Department's current interpretation of the ITAR's current text.  *See id.* at 31,528 ("The requirements of paragraph (b) are *not new*.  Rather, they are a more explicit statement of the ITAR's requirement." (emphasis added)).

What is more, the Department's assertion that the public domain exclusion requires prior authorization is conspicuously absent from Defendants' opening and reply briefs.[7]  However, during oral argument before the Second Circuit, the Department refused to represent that it would not prosecute Plaintiff for republishing information that is already in the public domain, "but is publicly available without the appropriate authorization....  If it is out there without the appropriate authorization, we cannot make such a representation[.]"  (Tr. 27:31-28:25).  The Department explained that

---

[7]     The briefs do, however, make veiled references to this interpretation.  (*See, e.g.*, Def. Br. 9-10 (discussing the June 3, 2015 notice, and disavowing "a definitive time frame for publication of any further iteration of the rule"); *id.* at 35 (rejecting the "premise that no published information was approved for release into the public domain"); Def. Reply 1-2 & n.3 (commenting on information "that is solely available from the internet and has not been authorized to be there")).

information "may be in some limited place, but through republication, the danger of it being provided to foreign persons is amplified. [For example,] something that's in an obscure journal, put on the Internet." (*Id.* at 29:50-30:20). Indeed, the Department adopted the position that, if information were to enter the public domain without authorization, then "the State Department should in fact be able to analyze those materials and offer its own response" as to whether the materials are "in fact something that would even be subject to the ITAR's licensing requirements." (*Id.* at 30:26-31:15). And because Defendants have advanced these interpretations of the ITAR earlier in this case, the Court will consider them here.[8]

To the extent that the Department interprets the ITAR to disqualify from the public domain exclusion any information that was made available to the public without prior authorization, the Court disagrees. To review, "[d]eference to an agency's interpretation is owed only when the regulation at issue is ambiguous." *Mullins*, 653 F.3d at 113. There is nothing ambiguous in the text of the ITAR's public domain exclusion that could be read to imply prior government authorization as a prerequisite. Nothing in the current ITAR's definition of public domain can reasonably be interpreted to suggest that data

---

[8]     Plaintiff spills significant ink discussing the Department's June 3, 2015 notice in the Federal Register, and the December 16, 2016 FAQ posting on the Department's website, both of which concern the republication of information that entered the public domain without prior authorization. The Department's May 24, 2013 response to comments in the Federal Register also concerns the Department's interpretation of the public domain exclusion: specifically, whether it covers aggregations and modifications of public domain data. The Court considers these as indications of the Department's interpretation of the regulation that are supplementary to Defendants' briefing.

that would otherwise qualify as public domain does not solely because it became publicly available without government authorization.

### b. The ITAR Does Not Disqualify Information from the Public Domain Exclusion Solely Because the Information Has Been Aggregated or Modified

Separately, Plaintiff argues that the ITAR requires an *ex ante* license to aggregate and modify public domain data. (*See* Pl. Reply 6 ("[T]he ITAR *still* imposes a prior restraint on putting aggregated technical data into the public domain by publishing it … because aggregating technical data, as the Plaintiff intends to do, creates a new set of technical data."); *see also* FAC ¶ 54 (alleging Plaintiff's intent to "aggregate and modify" public domain information)). Again, while understanding the source of Plaintiff's malaise, the Court disagrees with its argument based on the plain language of the ITAR.

Nowhere does the ITAR mention, or conceivably imply, either non-aggregation or non-modification as requirements for public domain status. To be sure, the Department's May 24, 2013 statement in the Federal Register suggests a different interpretation; there, the Department observed that "it is seldom the case that a party can aggregate public domain data for purposes of application to a defense article without … creating a data set that itself is not in the public domain." 78 Fed. Reg. 31,444, 31,445. Similarly, Defendants' opening brief asserts that aggregating public domain data "would not create ITAR-controlled technical data … [unless the] aggregation is 'for purposes of application to a defense article,' [and the aggregator] possesses the expertise necessary to make such an application." (Def. Br. 15; *see also* Def. Reply 3

(asserting "the Department's position [that there are] limited circumstances in which aggregation can create new technical data")). However, to the extent that the Department interprets the currently existing ITAR so that the bare fact of aggregation or modification, without more, could suffice to remove otherwise-qualifying data from the public domain exclusion, the Court rejects that interpretation. There is nothing ambiguous in the text of the exclusion that could be read to imply non-aggregation and/or non-modification as prerequisites for public domain status.[9]

### c.    ITAR-Controlled Technical Data Does Not Qualify for the Public Domain Exclusion Solely Because the Data May Be Widely Available on the Internet

The ITAR defines the public domain exclusion to include information that is "generally accessible or available to the public … [a]t libraries open to the public or from which the public can obtain documents." 22 C.F.R. § 120.11(a)(4). Plaintiff urges a broad interpretation of this provision, such that the phrase "libraries open to the public" would include the entirety of the Internet. (*See* Pl. Reply 5 (challenging the notion "that the public domain exclusion does not include the Internet")). Plaintiff reasons that "the Supreme Court has long equated the Internet to a public library," and therefore this Court should construe the ITAR's public domain exclusion to include the

---

[9]    This conclusion — that information otherwise covered by the public domain exclusion is not removed from the public domain solely by virtue of its aggregation or modification — does not immunize new, privately-created technical data from the ITAR's licensing requirements. While aggregation or modification, without more, is insufficient to remove data from the public domain, if the aggregation or modification of public domain data produces characteristics that otherwise trigger the ITAR's licensing requirements, those requirements still apply.

Internet. (Pl. Br. 16 (citing *Reno* v. *Am. Civil Liberties Union*, 521 U.S. 844, 853 (1997))).

Defendants raise two arguments in opposition. To start, Defendants assert that Plaintiff's current position — that the public domain exclusion covers information widely available on the Internet — contradicts Plaintiff's prior position before the Second Circuit at the preliminary injunction stage of this case. (Def. Br. 29-30; Def. Reply 4 n.6). The Court disagrees. It is true that Plaintiff's opening brief to the Second Circuit discussed the public domain exclusion in relation to the Internet. (*See* No. 16-315-cv, Appellant's Brief 53-54). However, that discussion conflated the issue of what information falls within the public domain exclusion — and may thus be *used* unrestricted by the ITAR — with the issue of what distribution channels the ITAR permits to *release* ITAR-controlled information, without running afoul of the export restrictions. A quick read of the brief evidences this conflation:

> [T]he preliminary injunction Stagg seeks would only prohibit enforcement of the ... prior restraint to *use* the public domain exclusion, including on materials that have already been placed there. ... (referencing 22 C.F.R. § 120.11(a)(1-8)). This section provides specific criteria to *release* information into the public domain. For example, the exclusion does not allow for publication on the Internet ... Thus, the requested preliminary injunction would not allow persons to upload technical data to the Internet because that is not one of the methods listed in the public domain exclusion. 22 C.F.R. § 120.11.

(*Id.* at 53-54 (emphases added) (internal citations and quotations omitted)). Given that this passage fails to differentiate the ITAR's enumerated sources of public domain materials from the independent issue of releasing ITAR-

controlled information by uploading it to the Internet, the passage does not clearly contradict Plaintiff's current position before this Court.

Next, Defendants oppose Plaintiff's interpretation of the regulation, countering that the definition of "public domain" in the ITAR "lists in (1)-(8) the specific ways in which information is in the public domain, and that list does not include the internet." (Def. Reply 9). In other words, Defendants urge a narrow interpretation of the regulation, where nothing that that is available exclusively from the Internet could qualify as a library open to the public. (*See id.* at 4 n.6 ("'[T]echnical data' from the internet … is not in the public domain if the information is not also available in printed materials available in bookstores or libraries.")).

The Court finds the text of the ITAR's public domain exclusion to be unambiguous, and therefore it owes no deference to the Department's interpretation of that text. *See Mullins*, 653 F.3d at 113. However, even without such deference, the Court agrees with Defendants' view that technical data must be available from one of the enumerated sources listed in the public domain exclusion in order to qualify for that exclusion. The text of the ITAR unambiguously restricts the public domain exclusion to information that is "generally accessible or available to the public" "through" or "at" one of eight sources. 22 C.F.R. § 120.11(a). These enumerated sources are a closed universe, not a set of examples. In so finding, the Court follows the reasoning of the Ninth Circuit, *see United States* v. *Hoffman*, Nos. 92-50299, 92-50354 and 93-50116, 1993 WL 468713, at *5 (9th Cir. Nov. 12, 1993) (unpublished

decision) ("The plain meaning of the regulation indicates that the information must fall within one of the [eight] categories to be within the 'public domain.'"), and of the District of Columbia, *see Colonial Trading Corp.* v. *Dep't of Navy*, 735 F. Supp. 429, 431 n.4 (D.D.C. 1990) (finding that "a release of the information into the public domain under a colloquial usage of the phrase" does not necessarily qualify for the public domain exclusion).

As to what qualifies as a "library" in the phrase "libraries open to the public," the Court again finds no ambiguity, but this time it disagrees with Defendants' interpretation. "Library" is a common term, the plain meaning of which is readily ascertainable by speakers of the English language. A "library" is not limited to brick-and-mortar buildings with print collections, and may exist on the Internet with digital collections.

Even if the term "library" were ambiguous, the Court would nonetheless reject the Department's interpretation. Where a regulation is ambiguous, an agency's "interpretation is entitled to controlling deference … unless it is plainly erroneous or inconsistent with the regulations or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Mullins*, 653 F.3d at 114 (internal citations, quotation marks, and alterations omitted). An interpretation of the term library that excludes all institutions and collections that exist solely on the Internet, just because they do not also exist off the Internet, is plainly erroneous and does not reflect a fair and considered judgment.

One definition of a "library" presented by the American Library

Association states:

> A library is a collection of resources in a variety of
> formats that is (1) organized by information
> professionals or other experts who (2) provide
> convenient physical, digital, bibliographic, or
> intellectual access and (3) offer targeted services and
> programs (4) with the mission of educating, informing,
> or entertaining a variety of audiences (5) and the goal of
> stimulating individual learning and advancing society
> as a whole.

Definition of a Library, AMERICAN LIBRARY ASS'N http://libguides.ala.org/library-

definition (quoting The Librarian's Book of Lists (Chicago: ALA, 2010)) (last

visited Jan. 28, 2019). Another such definition states: "A collection or group of

collections of books and/or other print or nonprint materials organized and

maintained for use (reading, consultation, study, research, etc.). Institutional

libraries, organized to facilitate access by a specific clientele, are staffed by

librarians and other personnel trained to provide services to meet user

needs." *Id.* And the Institute for Museum and Library Services defines a

"public library" as:

> A public library is established under state enabling
> laws or regulations to serve a community, district, or
> region, and provides at least the following: (1) an
> organized collection of printed or other library
> materials, or a combination thereof; (2) paid staff; (3) an
> established schedule in which services of the staff are
> available to the public; (4) the facilities necessary to
> support such a collection, staff, and schedule, and (5) is
> supported in whole or in part with public funds.

*Id.*

None of these definitions limits libraries to brick-and-mortar buildings, or to collections of print materials. Entities such as the Digital Public Library of America — which exists on the Internet, houses a collection comprising exclusively materials that "are immediately available in digital format," and counts among its Board of Directors the Commissioner and CEO of the Chicago Public Library, the Director of MIT Libraries, and a former Dean of Harvard Law School, among others — can readily satisfy the definition of a library. *See* About Us, DPLA, https://dp.la/about (last visited Jan. 28, 2019). The Court therefore declines Defendants' invitation to read the entirety of the Internet out of the definition of a library. Data sourced from the Internet is not categorically barred from coverage under the ITAR's public domain exclusion solely because it is not also available from an enumerated source that is not the Internet.[10]

---

[10]  In contrast, the Court wholeheartedly agrees with Defendants' argument, articulated in their opening brief, that the public domain exclusion should be interpreted such that:

> The ITAR does not require a license or other authorization to republish information that is available in printed books, newspapers, journals, and magazines that can be purchased in a physical bookstore or newsstand or checked out from a public library, because such information is already in the public domain and no longer considered ITAR-controlled technical data. The ITAR does not require a license or other authorization to publish fundamental research that meets the criteria set forth in § 120.11(a)(8), nor does it require a license or other authorization to publish information concerning the general scientific, mathematical, or engineering principles commonly taught in schools, colleges and universities, *id.* § 120.10(b)(1). The ITAR also does not require a license for purely domestic publication or dissemination of files. *See id.* § 120.17 (defining export).

(Def. Br. 18 (internal citations and quotation marks omitted)).

But while the Court finds Plaintiff's analogy between a library and the Internet compelling, it declines to construe the term "library" in the ITAR to include the *entirety* of the Internet. As Defendants point out,

> [T]he Internet differs fundamentally from a public library — virtually anyone with internet access can post information to the internet or republish information made available by someone else and there are no publication standards or systems of peer or editorial review to help ensure that sensitive national security information is not released.

(Def. Br. 31 n.17). Moreover, there are persuasive policy arguments not to include the entire Internet as an enumerated source constituting the public domain under the ITAR. As Judge Scheindlin previously recognized, if the Court were to read the ITAR as Plaintiff proposes, "*any* unclassified technical data leaked to the Internet would be fair game to republish in any forum without regard to consequences — and in an era where national security information has been successfully leaked, this is not a specious threat." *Stagg I*, 158 F. Supp. 3d at 211. (*See also* Def. Br. 31 n.17 ("[T]he risks of making technical data available to foreign adversaries, including advancing enemy weapons systems and arming insurgent groups, are even more significant [on the Internet].")).

In sum, for purposes of the ITAR's public domain exclusion, a library open to the public may exist on or off the Internet, but everything on the Internet does not qualify as a "library" solely by virtue of its presence online.

### d. Uploading ITAR-Controlled Technical Data to the Public Internet Qualifies as a "Deemed Export" Under the ITAR

The Court's final act of interpretation addresses Defendants' assertion that uploading ITAR-controlled technical data to the public Internet would qualify as an "export" for purposes of the ITAR's licensing requirements. (*See* Def. Br. 31 n.18 ("[T]he government took the position in *Defense Distributed* that dissemination of technical data in a manner that allows access by foreign persons — in that case through the internet — is an 'export' requiring appropriate authorization[.]")). *See also Defense Distributed* v. *U.S. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015). Plaintiff rejects this construction, and instead urges the Court to "limit the ITAR's construction to exclude publication as an export." (Pl. Br. 18). The Court agrees with Defendants.

Plaintiff maintains that "[t]he ITAR treats domestic publication as an export because the very nature of publishing means that foreign persons may access those materials domestically and then could take them abroad to manufacture defense articles." (Pl. Br. 18). Specifically, Plaintiff argues that the ITAR improperly regulates domestic publications, rather than solely exports, because the ITAR's licensing requirement applies to any speech that is not "to a purely domestic audience," and such an audience "must involve *only* U.S. persons — which is an impossibility when publishing information to public forums." (*Id.* at 19).

Importantly, however, Plaintiff never clearly specifies what language in the ITAR permits the Court to exclude publication as an export. Plaintiff's discussion of these issues in the context of its First Amendment arguments

cites the AECA's registration and license requirements for exporters, *see* 22 U.S.C. § 2778(b)(2), and the ITAR's registration requirements, *see* 22 C.F.R. § 122.1. (Pl. Br. 3-4). Neither of these categories of provisions mentions publication. However, in Plaintiff's discussion of the Fifth Amendment, it quotes the ITAR's current definition of "export," which includes "releasing or otherwise transferring technical data to a foreign person in the United States (a 'deemed export')." (Pl. Br. 23 (quoting 22 C.F.R. § 120.17(a)(2))). And Plaintiff also points to the Department's June 3, 2015 notice in the Federal Register stating that "[a] release of 'technical data' may occur by ... posting 'technical data' to the Internet." (Pl. Br. 17 (citing 80 Fed. Reg. 31,525, 31,528)). The Court therefore assumes that Plaintiff's argument concerning publication as an export applies to the Department's view that a "deemed export" includes uploading data to the public Internet.

To the extent that Plaintiff contends the Court should construe either the AECA or the ITAR to eliminate any licensing requirement for the foreign distribution of otherwise ITAR-controlled technical data via a particular technological medium such as the Internet, the Court declines. Nothing in either the AECA or the ITAR immunizes otherwise-regulated exports simply because they are undertaken through a particular technological medium. Plaintiff concedes as much in its reply, stating that "even ignoring that Plaintiff intends Internet publication — the same regulation applies to the publication of technical data, regardless as to whether that publication is to the Internet or in a book or in any other medium." (Pl. Reply 5).

On this score, the Court agrees with Defendants: The ITAR's restrictions on exports unambiguously apply to ITAR-controlled technical data regardless of the medium in which such data is exported. Uploading data to the public Internet — even a hypothetical domestic-only public Internet — qualifies as a "deemed export" under the ITAR because it "releas[es] or otherwise transfer[s] technical data to a foreign person in the United States." 22 C.F.R. § 120.17(a)(2). Of course, the ITAR does not apply to purely domestic disseminations limited to U.S. persons, thereby enabling private-sector research and industry development. (*See, e.g.*, Def. Br. 2 ("The ITAR sets forth a regulatory framework that recognizes that private companies developing munitions can further the national security and foreign policy interests of the United States, while simultaneously safeguarding those interests by prohibiting the unfettered access to defense articles and services by foreign countries and persons.")). But the regulation does restrict the unlimited release of ITAR-controlled technical data to foreign persons, even within the domestic territory of the United States. The Court declines to construe the ITAR to exclude domestic publication as an export where such publication releases or transfers ITAR-controlled technical data to foreign persons inside the United States.

### 4. The ITAR's Current Licensing Restrictions, Including Its Definitions of "Public Domain" and "Export," Do Not Violate the First Amendment

When Plaintiff's constitutional challenges are considered in terms of the unambiguous text of the ITAR — rather than Plaintiff's fears (or Defendants' wishes) regarding that text — the Court's constitutional analysis is

straightforward.  As Defendants point out, courts have repeatedly upheld the

constitutionality of the ITAR's licensing requirements against First Amendment

challenges.  (Def. Br. 19-20).  In the words of the Ninth Circuit,

> [T]he AECA prohibits export without a license of items on the USML without regard to content or viewpoint … The purpose of the AECA does not rest upon disagreement with the message conveyed.  ITAR defines the technical data based on its function and not its viewpoint.  Accordingly, we find that the AECA and its implementing regulations are content-neutral.  Because the AECA and its implementing regulations are content-neutral, we apply the intermediate scrutiny standard under *O'Brien*. 391 U.S. 367 (1968).… [W]e hold that the AECA and its implementing regulations withstand intermediate scrutiny because they substantially advance the Government's important interest in the regulation of international dissemination of arms information.

*United States* v. *Mak,* 683 F.3d 1126, 1134-35 (9th Cir. 2012) (internal

citations and quotations omitted).  The ITAR's restrictions on speech are

content-neutral and survive intermediate scrutiny under *O'Brien* because "they

substantially advance important governmental interests unrelated to the

suppression of expression."  *Id.*

Nor are the AECA and its implementing regulations unconstitutionally

overbroad, because "the AECA delineates narrowly the scope of information

subject to arms controls.  The AECA and ITAR specifically carve out exceptions

to the law for the types of information that are subject to the highest levels of

First Amendment protection, for example, published scholarly works."  *Mak*,

683 F.3d at 1136 (internal citations, quotation marks, and alterations omitted).

Moreover, as Defendants point out, "the AECA and ITAR restrict only the *export*

of technical data, not domestic dissemination." (Def. Br. 22 (citing *Defense Distributed*, 121 F. Supp. 3d at 695)). The Court agrees that the AECA and the ITAR are content-neutral restrictions on speech that survive intermediate scrutiny under *O'Brien* and are not unconstitutionally overbroad.

When the ITAR is properly construed, each of Plaintiff's First Amendment challenges to it fails. *First*, Plaintiff argues that the ITAR's currently existing public domain exclusion imposes an unconstitutional prior restraint because it requires *ex ante* licensing to republish technical data that entered the public domain without prior authorization from the Department, and to aggregate or modify existing public domain information. (*See, e.g.*, Pl. Br. 3 ("[T]he ITAR *currently* imposes a prior restraint to use the public domain exclusion by ... the republication of such publicly available technical data."); Pl. Reply 6 ("[T]he ITAR *still* imposes a prior restraint on putting aggregated technical data into the public domain by publishing it.... because aggregating technical data, as the Plaintiff intends to do, creates a new set of technical data.")). Plaintiff concedes, however, that information that falls within the public domain exclusion is not subject to the ITAR's licensing provisions, "is no longer regulated" (Pl. Br. 4), and "may be freely published without the Government's approval" (*id.* at 2).

As explained above, Plaintiff's argument proceeds from a misapprehension of the public domain exclusion; the exclusion does not restrict either the republication of information that entered the public domain without prior authorization by the Government, or the dissemination of public

36

domain information solely because it has been aggregated or modified. As a result, Plaintiff has failed to identify any aspect of the public domain exclusion that operates as a prior restraint, and its arguments that the public domain exclusion fails the procedural requirements for constitutional prior restraints are irrelevant. (*See* Pl. Br. 8-16; Pl. Reply 17-25). The Court thus agrees with Defendants that "the *Freedman* factors are not the appropriate legal test" to evaluate the constitutionality of the public domain exclusion under the First Amendment. (Def. Br. 23). Indeed, Plaintiff has not identified any aspect of the public domain exclusion that restricts expressive activity in any way. Under any standard of First Amendment scrutiny, therefore, Plaintiff's challenge to the ITAR's public domain exclusion fails.

*Second*, Plaintiff argues that the ITAR "imposes a prior restraint on publication on the Internet[.]" (Pl. Br. 16). To start, since information that is generally available online does not necessarily qualify for the public domain exclusion, the ITAR can restrain the *rep*ublication of that information. (*See id.* ("The ITAR's prior restraint on publication on the Internet also violates the First Amendment[.]"); Pl. Reply 5 (opposing the position "that the public domain exclusion does not include the Internet")). And since uploading information to the public Internet qualifies as a "deemed export," the ITAR can restrain the dissemination of information via the Internet. *See* 22 C.F.R. § 120.17(a)(2).

(*See* Pl. Reply 6-7 ("[T]he ITAR *still* imposes a prior restraint on holding a conference or seminar on the Internet that involves technical data[.]")).[11]

Of course, neither of these scenarios involves an Internet-specific prior restraint. The mere fact that ITAR-controlled technical data might be sourced from, or exported via, the Internet does not alter the Court's constitutional analysis. As explained above, ITAR-controlled technical data that is sourced from non-library places on the Internet is subject to the same licensing requirements as any other technical data not in the public domain. Plaintiff has not made a case for Internet exceptionalism in analyzing the ITAR's speech-licensing provisions. Therefore, Plaintiff's argument is, effectively, that the ITAR's licensing restrictions on republishing any technical data not in the public domain — as the term is defined in the ITAR — are an unconstitutional prior restraint. They are not. Similarly, interpreting the current ITAR's definition of a "deemed export" to include uploads to the Internet does not restrict the publication of *otherwise unregulated* information to the Internet, such as information that falls within the public domain exclusion; it merely recognizes that publication on the public Internet is one means of "releasing or otherwise transferring technical data to a foreign person in the United States[.]" 22 C.F.R. § 120.17(a)(2).

---

[11]     Plaintiff's briefing conflates these two scenarios. (*See* Pl. Br. 16-18; Def. Br. 18 ("Plaintiff's brief appears to conflate the public domain exclusion ... and the ITAR's requirements that a license ... be obtained prior to an unrestricted dissemination of ITAR-controlled technical data[.]")).

"The ITAR's licensing requirements apply to a broad range of technical data related to items on the USML, and the 'export' of that data involves transmission to foreign persons in a variety of contexts[.]" (Def. Br. 19). For the reasons stated above and explained in *United States* v. *Mak,* the ITAR's licensing requirements are content-neutral restrictions on speech that survive intermediate scrutiny under *O'Brien* and are not unconstitutionally overbroad. *See* 683 F.3d at 1134-35.

### 5. The ITAR's Licensing Restrictions, Including Its Definition of "Export," Do Not Violate the Fifth Amendment

A statute or regulation is unconstitutionally vague under the Due Process Clause of the Fifth Amendment if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States* v. *Williams*, 553 U.S. 285, 304 (2008). When determining a Fifth Amendment due process challenge for impermissible vagueness, courts consider "whether a statute is vague as applied to the particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) (internal citation, quotation marks, and alterations omitted). The Court must therefore determine whether Plaintiff "*in fact* had fair notice that the statute and regulations proscribed [its] conduct." *United States* v. *Hsu*, 364 F.3d 192, 196 (4th Cir. 2004).

Plaintiff argues that "the ITAR's regulation of domestic publication violates the Fifth Amendment" because it is unconstitutionally vague and *ex post facto*. (Pl. Br. 22). Plaintiff cabins its challenge, however, by stating that "the issue here concerns only the *publication* of technical data, which qualifies as 'exempt' once published into various public forums." (Pl. Br. 23 (citing 22 C.F.R. §§ 120.10(b) & 120.11)). The FAC alleges that Plaintiff wishes to distribute, via its website, "published and generally accessible public information that is available from bookstores and libraries, and for which foreign persons already have access to," that "would have otherwise constituted technical data but is excluded from the technical data provisions because it is in the public domain." (FAC ¶ 49). The information was "not authorized by the Defendants into the public domain." (*Id.* at ¶ 52).

As explained above, technical data that is otherwise ITAR-controlled does not qualify for the public domain exclusion simply by virtue of being sourced from the Internet. Therefore, Plaintiff has fair notice that the ITAR proscribes the republication of ITAR-controlled technical data, even if that data is sourced from the Internet, and even if that data is republished via upload to the Internet.

In 2015, the Western District of Texas considered a Fifth Amendment challenge to the ITAR's prior definition of export, which was then defined to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." *Defense Distributed*, 121 F. Supp. 3d at 701 (quoting 22 C.F.R. § 120.17(a)(4)).

The plaintiff in *Defense Distributed*, as here, wished to post ITAR-controlled technical data to the public Internet. *Id.* At the preliminary injunction stage, the court concluded that the ITAR's definition of an export did not violate the Fifth Amendment because "[p]ersons of ordinary intelligence are clearly put on notice by the language of the regulations that such a posting would fall within the definition of export." *Id.*[12] The Court agrees with this reasoning. Moreover, the 2016 ITAR revision defining "export" to include "releasing or otherwise transferring technical data to a foreign person in the United States (a 'deemed export')" did not substantially alter the regulation. Therefore, the Court concludes that the current ITAR's definition of "export" is not unconstitutionally vague under the Fifth Amendment.

## CONCLUSION

The Court recognizes that certain portions of this Opinion may engender cognitive dissonance to readers of two prior opinions in this case. *See Stagg I*, 158 F. Supp. 3d at 210 ("Plaintiff also raises several arguments regarding its likelihood of success on the merits that the Government would be wise to note."); *Stagg II*, 673 F. App'x at 97 ("But just as Stagg's refusal to disclose — even to the district court — the information it seeks to publish, and whether that information is already publicly available, makes it appropriate to deny the broad preliminary injunction sought, we note concern with the government's

---

[12]     On appeal the Fifth Circuit upheld the district court's denial of the preliminary injunction, but stated that it "take[s] no position on" the merits of the issue "whether posting files online for unrestricted download may constitute 'export[.]'" *Defense Distributed* v. *U.S. Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016).

representations at oral argument....  We state only that, while we affirm the order denying the broad injunction sought by Stagg, we do so without prejudice to the pursuit of narrower relief in the district court.").  However, it was only in the context of the parties' more detailed briefing on the merits that the Court engaged with the nuances of their competing interpretive arguments.

To review, the Court finds it understandable that Plaintiff brought this litigation, given the aggressive interpretations of the ITAR that have recently been advanced by the Department.  However, not all of these interpretive glosses are correct statements of the law, as the Court has explained, and the ITAR, when properly construed, does not implicate the constitutional concerns identified by Plaintiff.

For the reasons stated in this Opinion, Plaintiff's motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     January 30, 2019
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge